UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNIVERSAL CASUALTY COMPANY,          No. 2:11-cv-00934-MCE-GGH

      Plaintiff,

   v.

FRED C. GODINEZ III,
et al.,
                          MEMORANDUM AND ORDER

      Defendants.

_____

AND RELATED CROSS-ACTIONS AND
THIRD PARTY ACTIONS

----oo0oo----

    Before the Court is Defendant National Transportation
Associates Inc.'s ("NTA") Motion to Dismiss ("MTD") Plaintiff
Universal Casualty Company's ("UCC") First Amended Complaint (ECF
No. 37) ("MTD").

///

///

///

///

1

Also before the Court is Third-Party Defendant Crusader Insurance Company's ("Crusader") Motion to Dismiss Third-Party Plaintiffs Yogesh Kumar ("Kumar") and Links Insurance Company's ("Links") Third-Party Complaint (ECF No. 56) ("MTD3PC").[1]  For the reasons that follow, NTD's Motion is DENIED and Crusader's Motion is GRANTED without leave to amend.  In addition, the Court <u>sua sponte</u> DISMISSES, without leave to amend,  Godinez's Third Party Complaint against Crusader (ECF No. 51) for failure to state a claim.  Finally, The Court <u>sua sponte</u> DISMISSES, with leave to amend, the cross-claims of and Links and Kumar (ECF No. 42) and Godinez (ECF No. 51) for failure to state a claim.

## BACKGROUND[2]

The facts alleged in UCC's FAC (ECF No. 27) are generally the same as those alleged in its original Complaint; the Court will, except where otherwise noted, simply republish its Background Section from its December 15, 2011 Order. (ECF No. 26.)

///

///

---

[1] Because oral argument would not be of material assistance, the Court ordered this matter submitted on the briefing.  E.D. Cal. R. 230(g).

[2] The following facts are taken from UCC's First Amended Complaint (ECF No. 1) ("FAC") as well as Kumar and Links' First Amended Cross-Claim and Third-Party Complaint (ECF No. 42) ("3PC").   Page references will be to the Court's ECF pagination. For the purposes of this Motion, the Court accepts UCC's and Kumar and Links' facts as true and makes all inferences in the light most favorable to Plaintiff/Third-Party Complainants.

This case arises from the commercial relationship between Universal, an insurance carrier, and Defendants, individuals and entities who were in the business of selling insurance policies on behalf of Universal.  Universal provided insurance to its customers ("policyholders") by relying on the services of various managing general agents who would quote, bind and issue the insurance policies.

Between August 2005 and July 2009, Defendant Godinez was a Shareholder, President, Director and Officer of Sovereign General Insurance, Inc. ("Sovereign").  From April 2008 to July 2009, Defendant Kumar became the majority shareholder, CFO, Director and Officer of Sovereign.  Kumar was also the Chairman of Sovereign's Board of Directors between 2008 and 2009.  Together with Godinez, Kumar controlled, directed and oversaw Sovereign's operations between 2008 and 2009.

Kumar, Godinez, and Sovereign were at all relevant times licensed as insurance brokers and agents by the California Department of Insurance and the Arizona Department of Insurance. As part of its business, Sovereign functioned as the managing general agent for various insurance carriers, including Universal.

///
///
///
///
///
///
///

3

**A.    The Program Manager Agreement**

On August 2, 2005, Plaintiff entered into a Program Manager Agreement ("PMA") with Sovereign.[3]  Through the PMA, Universal appointed Sovereign as its non-exclusive managing general agent, authorized to bind commercial vehicle-related insurance policies on behalf of Universal in California and Arizona.

Under the PMA, Sovereign's duties and responsibilities included, among other things, (I) soliciting customers; (ii) underwriting insurance policies and binding risks on behalf of Universal; (iii) charging, collecting, holding, and remitting all premiums due on policies bound or written under the PMA; (iv) refunding Return Unearned Premiums, resulting from cancellations or to Insured Parties and Premium Finance Companies when appropriate; (v) accounting for all transactions and insurance policies written under the PMA; and (vi) other work necessary or incidental to the insurance business written under the PMA.

Under Article III.N. of the PMA, labeled "Fiduciary Capacity - Premium Trust Funds," Sovereign was obligated to "act as a fiduciary for [Universal]" and the insurance premiums collected from "policyholders" were required to be deposited into a segregated premium trust account (the "Premium Trust Account"). The Premium Trust account was opened at Pacific State Bank under the name "UCC Trust Account" (i.e., "Universal Casualty Trust Account").

---

[3] It is undisputed that the PMA was in force at all times relevant to the dispute at issue.

Article III.N.3. prohibited Sovereign from commingling any premiums or other funds relating to insurance policies written under the PMA with funds it held in any other capacity. Specifically, subject to certain exceptions set forth in the PMA, the Premium Trust Account existed "solely for the ... approved purpose" of (I) holding and remitting amounts due to Universal under the PMA, (ii) refunding Return Premiums to Insured Parties and Premium Finance Companies and (iii) withdrawing Sovereign's earned commissions.

Under the PMA, insurance premiums collected from an Insured Party or Premium Finance Company must be refunded to such party in certain situations (known as a "Return Premium") where (I) the Insured Party's policy is canceled; (ii) there is a reduction in the number of insured vehicles in a fleet; or (iii) when the Insured Party or Premium Finance Company paid a greater estimated premium at the time of purchasing the policy, and the premium is later determined to be less than the initial estimate.

Pursuant to the PMA, Sovereign and its agents were expressly obligated to refund Universal for commissions it retained on account of premiums that were sold but later required to be refunded to Insured Parties or Premium Finance Companies as Return Premiums.

On the same day of the PMA signing, Godinez executed the "Program Manager Agreement - Sovereign General Insurance, Inc. Manager's Personal Guaranty" (the "Guaranty").

///

///

///

The Guaranty (1) Promised Sovereign's obligations to collect and forward premiums received by the issued insurance policies written by Sovereign on behalf of Universal; (2) Promised that Sovereign would manage and account for the trust funds in the Premium Trust Account in accordance with the PMA; and (3) Promised Sovereign's payment of interest amounts due under the PMA and payment of costs and attorney's fees incurred in collecting amounts due.

The Guaranty, to which Godinez provided his personal guaranty of "faithful performance of all the terms and conditions of the [PMA]," listed Godinez as an "officer of Manager."  The PMA defines the term Manager as "Sovereign and all related entities as identified in the ENDORSEMENTS attached [to the PMA] and made part of this Agreement (**collectively and individually**: 'Manager')." (emphasis in original).  The Guaranty was incorporated as part of the PMA as Endorsement G thereto.

**B.    Godinez's and Kumar's Alleged Wrongful Conduct**

Between the execution of the PMA in 2005 and the termination of the agreement in 2009, Plaintiff alleges Defendants Godinez and Kumar breached their statutory and contractual fiduciary duties owed to Universal with respect to premiums collected on Universal's behalf.  Specifically, between 2005 and 2009, Godinez, through his position at Sovereign, caused multiple transfers from Sovereign's bank accounts to himself and a number of insiders.  The funds transferred were allegedly funds from the premiums owed to Universal.

Between the years 2008 and 2009, Plaintiff alleges that Defendant Kumar caused multiple transfers from Sovereign's bank accounts to himself and a number of insiders totaling $1,465,950.00.  Alleged insiders include Links, Mr. Subhas Chand (his father), Krishna Devi, DD/BS, LLC, and Din Sharma.  These funds allegedly consisted of premiums due to Universal.

Pursuant to the PMA, each month Sovereign would prepare and submit a monthly spreadsheet (each spreadsheet is referred to as a "Bordereau" and two or more Bordereau, "Bordereaux") showing: (I) the gross premium due to Universal for each policy written by Sovereign for Universal; (ii) the Return Premium due to an Insured Party, if any; (iii) the amount of Sovereign's commission; and (iv) the net premium owed to Universal after deductions for any Return Premium and for Sovereign's commission (the "Net Bordereau Premium").  According to Plaintiff, the Bordereaux were prepared at the direction and with the approval of Kumar and Godinez.

Additionally, under the PMA agreement, Sovereign would issue a check bimonthly to Universal for the Net Bordereau Premiums which included all premium sales for the prior month.  The amount of each check was based on the Bordereau prepared for the prior month.

On June 30, 2009, Universal received a check from Sovereign in the amount of $511,702.40 payable out of the Premium Trust Account for the Net Bordereau Premium of April 2009 (the "June 30 Check").  Universal was unable to deposit the June 30 Check because Sovereign allegedly placed a stop payment on the check.
///

Plaintiff alleges that when Universal asked Sovereign to remove the hold, Sovereign, through Kumar and Godinez, failed to do so, so the check did not clear.  Subsequently, Universal contacted Pacific State Bank and was told that the Premium Trust Account held a total of only $67.00.

According to the three Bordereaux statements Sovereign submitted to Universal for the months of April, May and June 2009, at least $1,867,823.00 of Net Bordereaux Premiums were owed to Universal and should have been available in the Premium Trust Account.

Subsequent to terminating its commercial relationship with Sovereign, Universal started receiving complaints from various Insured Parties and Premium Finance Companies that they never received their owed Return Premiums.  Universal claims that Sovereign, through Godinez and Kumar, failed to refund Return Premiums to Insured Parties and Premium Finance Companies, even though Sovereign was reporting on the Bordereaux statements represented to Universal that it was paying such refunds.  As a result, Universal has bore the cost and used its own funds to make these refunds.  To date, Universal has refunded approximately $577,209.00 of Return Premiums to affected parties.

Universal claims that Sovereign, pursuant to California law, which imposes personal liability on Officers and Directors, owes Universal at least $2,377,041.60.

///

///

///

///

1    Turning to the present motions, on December 15, 2011, the

2    Court issued its Order granting in part and denying in part

3    Defendants' Motion to Dismiss, pursuant to Fed. R. Civ. P.

4    12(b)(6) the original complaint.[4]  (See ECF No. 26.)  Of note, in

5    that Order the Court explicitly rejected Defendants' contention

6    that joinder was required for a lawsuit brought by Crusader

7    against them in the San Joaquin Superior Court.  (See id. at

8    8-10.)

9    On January 3, 2012, UCC filed its First Amended Complaint

10   (ECF No. 27), which adds some additional factual detail and a

11   cause of action for Negligent Interference With Contractual

12   Relations, but is otherwise similar to the original complaint

13   (ECF No. 1).

14   On February 17, 2012, NTA filed its Motion to Dismiss.  (ECF

15   No. 37.)  In its Motion, NTA notes that only UCC's Fifth Cause of

16   Action (conversion) and Sixth Cause of Action (fraudulent

17   transfer) are asserted against NTA.  NTA argues that the Court

18   must dismiss both causes of action as to it on the basis that UCC

19   has failed to demonstrate that Defendant Kumar formed NTA with

20   converted funds, and UCC does not otherwise allege any wrongful

21   conduct against NTA.[5]

22

23   _____

       [4] Unless otherwise noted, all further references to Rule or
24   Rules are to the Federal Rules of Civil Procedure.

25   [5] Pursuant to Federal Rules of Evidence 201(b) (authorizing
     judicial notice of adjudicative facts 'capable of accurate and
26   ready determination by resort to sources whose accuracy cannot be
     reasonably questioned'), NTA requests the Court take judicial
27   notice of its incorporation documents.  (Request for Judicial
     Notice ("RJN") (ECF No. 38) NTA's request is unopposed and is the
28   proper subject of judicial notice.  See, e.g., Champlaie v. BAC
                                                    (continued...)

1  (MTD at 6-10.)  UCC opposes NTA's Motion.  ("UCC Opp.," ECF
2  No. 47.)

3       On March 2, 2012, Kumar and Links filed their six-page First
4  Amended Cross-Claim and Third-Party Complaint against Godinez, as
5  the Cross-Defendant, and against Crusader, as the Third Party
6  Defendant.  (ECF No. 42.)  In this document, Kumar and Links
7  allege that the alleged wrongful conduct at issue in this action
8  is also the subject of the lawsuit brought by Crusader which is
9  pending in the San Joaquin Superior Court.  (Id. at 3.)  Beyond
10 that, virtually no other facts are alleged.  (Id. at 3-4.)  Kumar
11 and Links bring three causes of action, none of which identify
12 any statutes, case law, or any other basis for their claims.
13 Specifically, they bring the following causes of action seeking:
14 (1) indemnification from all Cross-Defendants but Crusader;[6]
15 (2) indemnity and contribution from all Cross-Defendants but
16 Crusader in the event that UCC should prevail against them; and
17 (3) apportionment of damages as to all Cross-Defendants and
18 Third-Party defendants (so including Crusader), alleging that
19 they are all the proximate cause of UCC's damages and seek
20 apportionment of fault.  (Id. at 4-5.)

21

22
23       [5](...continued)
   Home Loans Servicing, LP, 706 F. Supp.2d 1029, 1040 (E.D. Cal.
24 2009); Lee v. County of Los Angeles, 250 F.3d 668, 688 (9th Cir.
   2001) (court may take judicial notice of matters of public
25 record).  Accordingly, NTA's RJN is granted.

26       [6] It is unclear what "Cross-Defendants" or "Third Party
   Defendants" Links and Kumar are referring to as they only name
27 Godinez and the Third-Party Defendant and Crusader as the Cross-
   Claimant.  They also refer to "Roes 1-10" inclusive, but they are
28 not listed in the caption and there is no indication in this
   filing as to who those Roes might refer to.  (See 3PC ¶ 6.)

On March 22, 2012, Godinez filed a Cross-Claim and Third-Party Complaint against Kumar, Links, NTA and Roes 20-25, as well as against Crusader. (ECF No. 51.) In this action, Godinez generally alleges that the Cross-Defendants are subject to UCC's lawsuit and that Crusader has brought an identical action in state court and has been brought in as a Third-Party Defendant by Kumar and Links. (Id. at 2-4.) Like Kumar and Links' First Amended Cross-Claim and Third-Party Complaint, Godinez raises three claims a claim for indemnification, as well as indemnity and contribution against the Cross-Defendants, as well as a third cause of action which also adds Crusader and seeks indemnification and other relief. (Id. at 4-7.)

On April 3, 2012, Crusader filed its Motion to Dismiss Kumar and Links' Third-Party Complaint.[7] (ECF No. 56, 57.) In this motion, Crusader generally argues that Kumar and Links Third-Party Complaint fails to meet the pleading standards established by Rule 8(a), that Crusader is not a proper party to this action, and that the Court should use its discretion to abstain, decline jurisdiction, and dismiss the Third Party Complaint.

///

///

///

///

---

[7] Pursuant to Federal Rules of Evidence 201(b), Crusader requests that the Court take judicial notice ("Crusader's RJN," ECF No. 58) of (1) the docket sheet from the San Joaquin Superior Court action where Crusader is the plaintiff. (Ex. A); (2) a Notice of Ruling from the state court action(Ex. B); and (3) this Court's December 15, 2011 Order (ECF No. 26) ( Ex. C). The RJN is unopposed. For the reasons set forth in footnote 5, the Court finds these documents are the proper subject of judicial notice.

1 (Id.)   Kumar and Links oppose this motion.[8] (("Opp. to MTD3PC"),
2 ECF No. 60.)

3

**Standard for 12(b)(6) Motion to Dismiss**

5

6        On a motion to dismiss for failure to state a claim under
7 Rule 12(b)(6), all allegations of material fact must be accepted
8 as true and construed in the light most favorable to the
9 nonmoving party.   Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336,
10 337-38 (9th Cir. 1996).   Rule 8(a)(2) requires only "a short and
11 plain statement of the claim showing that the pleader is entitled
12 to relief" in order to "give the defendant fair notice of what
13 the. . . claim is and the grounds upon which it rests."   Bell
14 Atl. Corp. v. Twombly, 550 U.S. 544, 554-55 (2007) (internal
15 citations and quotations omitted).   Though "a complaint attacked
16 by a Rule 12(b)(6) motion to dismiss does not need detailed
17 factual allegations, a plaintiff's obligation to provide the
18 'grounds' of his 'entitlement to relief' requires more than
19 labels and conclusions, and a formulaic recitation of the
20 elements of a cause of action will not do."   Id. at 555 (internal
21 citations and quotations omitted).
22 ///

23

24        [8] Pursuant to Federal Rules of Evidence 201(b), Kumar and
Links request that the Court take judicial notice ("K&L's RJN,"
25 ECF No. 61) of (1) the First Amended Complaint filed in the
San Joaquin Superior Court action where Crusader is the plaintiff
26 (Ex. A); (2) UCC's FAC (Ex. B); Kumar and Links' Motion to
Dismiss (ECF No. 7)(Ex. C); and civil minutes from the
27 San Joaquin Superior Court action where Crusader is the
Plaintiff.   The RJN is unopposed.   For the reasons set forth in
28 footnote 5, the Court finds these documents are the proper
subject of judicial notice.

A plaintiff's factual allegations must be enough to raise a right to relief above the speculative level. _Id._ (citing 5 C. Wright & A. Miller, _Federal Practice and Procedure_ § 1216, pp. 235-36 (3d ed. 2004) ("The pleading must contain something more. . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action")).

Moreover, "Rule 8(a)(2) . . . requires a 'showing,' rather than a blanket assertion of entitlement to relief.  Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirements of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." _Twombly_, 550 U.S. at 555, n.3 (internal citations omitted).  A pleading must contain "only enough facts to state a claim to relief that is plausible on its face." _Id._ at 570; _see also Ashcroft v. Iqbal_, 556 U.S. 662, 677-679 (2009). If the "plaintiffs . . . have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." _Twombly_, 550 U.S. at 570; _Iqbal_, 556 U.S. at 680.

A court granting a motion to dismiss a complaint must then decide whether to grant leave to amend.  Rule 15(a) empowers the court to freely grant leave to amend when there is no "undue delay, bad faith[,] dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of . . . the amendment, [or] futility of the amendment. . . ." _Foman v. Davis_, 371 U.S. 178, 182 (1962).  Leave to amend is generally denied when it is clear the deficiencies of the complaint cannot be cured by amendment.

///

DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir.
1992); Balistieri v. Pacifica Police Dept., 901 F. 2d 696, 699
(9th Cir. 1990) ("A complaint should not be dismissed under Rule
12(b)(6) unless it appears beyond doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle
him to relief.")(internal citations omitted).

## Analysis

Before the Court is Defendant NTA's Motion to Dismiss UCC's
First Amended Complaint (ECF No. 37).  Also before the Court is
Crusader's Motion to Dismiss Kumar ("Kumar") and Links' Third
Party Complaint (ECF No. 56).  Each will addressed in turn.

**A.   NTA's Motion to Dismiss**

**1.   Parties' Contentions**

NTA notes that UCC's FAC alleges that Kumar used funds
wrongfully acquired from UCC to form and/or maintain NTA as the
basis for its fifth and sixth causes of action, which are for
conversion and fraudulent transfer, respectively.  (MTD at 6; FAC
¶¶ 85-110, 114.)  NTA contends that it was incorporated on
December 19, 2008, but that the earliest time that UCC asserts
Sovereign failed to maintain sufficient funds in its account was
April 2009.  (See MTD at 6-7; RJN, ECF No. 38; FAC ¶¶ 49-50,
108.).  NTA therefore contends that the allegation that Kumar
used funds to form NTA is necessarily false.  (MTD at 7.)

Furthermore, NTA contends that UCC has failed to sufficiently allege facts that would support either the conversion or fraudulent transfer causes of action. (Id. at 8-8.)

UCC responds that, in its FAC, it alleges that between 2008 and 2009 Kumar siphoned off funds that were due to UCC to, inter alia, "form and/or maintain" NTA, (UCC Opp., ECF No. 47 at 7; FAC ¶¶ 42, 43, 90, 108.) UCC contends that NTA is misreading the FAC by claiming that the conversion began in April 2009, when UCC alleges it occurred between 2008 and 2009. In addition, UCC argues that NTA misreads the FAC when it claims that UCC funds could not have been used to form NTA because NTA was formed in December 2008 and the alleged fraud occurred in April 2009. (Id. at 9.) UCC asserts that, by alleging that the fraud occurred between 2008 and 2009, the FAC sufficiently supports their theory that wrongfully obtained UCC funds could have been used to form NTA. (Id.) UCC also contends that NTA does not sufficiently rebut their additional or alternative theory that the funds were used to maintain NTA. (Id. at 9-10.) Furthermore, UCC contends it has sufficiently pleaded its conversion and fraudulent transfer claims.

   **2.   Analysis**

In its FAC, UCC clearly alleges that, between 2008 and Sovereign's collapse in 2009, Kumar initiated wrongful and fraudulent transfers from Sovereign's bank accounts, including the UCC Trust Account, to various third parties. (See, e.g., FAC at ¶¶ 42, 43, 89-110.

Further, UCC's FAC explicitly states that the funds were used to "form and/or maintain NTA." (FAC ¶ 108.)  NTA's argument that because its incorporation predates the collapse of Sovereign and the discovery of the wrongful transfers, UCC's claim must fail, as the wrongfully obtained funds could not have been used to form NTA, therefore misses the mark in two key respects.

First, UCC has sufficiently alleged that the wrongful transfers occurred early enough to have contributed to the formation of NTA.  Second, UCC also contends that funds could have been used to "maintain" NTA.  So, even if no wrongful transfers occurred before NTA's formation, they could still have been used after NTA's formation.  Therefore, NTA's incorporation date argument fails.

Furthermore, UCC has sufficiently pleaded both its conversion and fraudulent transfer claims to survive NTD's motion to dismiss.  "The elements of a conversion claim are (1) the plaintiff's ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." Mindys Cosmetics, Inc. v. Dakar, 611 F.3d 590, 601 (9th Cir. 2010).  UCC has sufficiently alleged that it had a right to the possession of the funds at issue at the time of the conversion and that it was damaged by its failure to receive the same. Furthermore, UCC has sufficiently alleged that NTA was responsible for the acts complained of, as UCC alleges that Kumar misappropriated the funds for the benefit of NTA.  Id.

///

///

16

("'Where the conversion is the result of the acts of several persons, which, though separately committed, all tend to the same end, there is a joint conversion. . . . If the principal is a wrong-doer, the agent is a wrong-doer also.'" (quoting McCafferty v. Gilbank, 249 Cal. App.2d 569, 576 (Cal. Ct. App. 1967))).

Similarly, UCC's fraudulent conversion claim is also sufficiently stated to survive NTA's Motion to Dismiss.  First, the Court has previously upheld this cause of action against NTA in its prior Order.  (See ECF No. 26 at 16-17.)  Second, NTA bases its claim on its contention that it was formed before the allegedly fraudulent transfers occurred.  However, the Court has already rejected this contention as baseless.

Because UCC has sufficiently stated facts in support of its claim against NTA, and because UCC has sufficiently pleaded both conversion and fraudulent transfer against NTA, NTA's Motion to Dismiss is denied.

**B.   Crusader's Motion to Dismiss the Third Party Complaint**

**1.   Parties' Contentions**

Crusader contends that Kumar and Links' Third Party Complaint must be dismissed because, inter alia: (1) it fails to sufficiently state a claim under Rule 8(a) and is "completely incomprehensible, unintelligible and hopelessly vague"; and (2) Crusader is not a proper party to this action, whether joined under Rule 19 or 20.  (ECF No. 57 at 7-14.)

17

1  Crusader asks this Court to exercise its discretion and decline
2  jurisdiction.  (Id. at 14-17.)  In response, Kumar and Links
3  assert they are requesting a judicial determination of the
4  amounts that UCC and Crusader are entitled to recover from a
5  single source, therefore Crusader should properly be joined in
6  this action as a Third Party Defendant.  (ECF No. 60 at 5-9.)  In
7  their Reply, Kumar and Links argue that Crusader is a necessary
8  party and must be joined pursuant to Rule 19(a)(1).

10      **2.   Analysis**

12      In its prior Order, the Court rejected Defendants'
13  contention that Crusader was a necessary party to this action
14  under Rule 19(a)(1).  (See ECF No. 26 at 8-10.)  To the extent
15  that Kumar and Links are attempting to relitigate that issue by
16  means of a Third-Party Complaint, their arguments fail.

17      In addition, the Court agrees with Crusader's argument that
18  Kumar and Links' Third-Party Complaint is "completely
19  incomprehensible, unintelligible and hopelessly vague."  Other
20  than asserting that Crusader has initiated a similar lawsuit in
21  San Joaquin County against them, Plaintiffs have not provided
22  either Crusader or the Court with either factual allegations or
23  legal argument that would support any theory of recovery against
24  either Crusader, or against each other as cross-claimants.  Such
25  conclusory and vague allegations violate the Rule 8(a) pleading
26  standards established by Iqbal and Twombly.  See, e.g.,
27  Twombly, 550 U.S. at 555, n.3 ("Rule 8(a)(2) . . . requires a
28  'showing,' rather than a blanket assertion of entitlement to

relief.  Without some factual allegation in the complaint, it is
hard to see how a claimant could satisfy the requirements of
providing not only 'fair notice' of the nature of the claim, but
also 'grounds' on which the claim rests.") (internal citations
omitted)).

Crusader is not asserting a joint right to relief with UCC
and Kumar and Links have not sufficiently alleged facts that
would suggest that joinder is otherwise appropriate here.  The
Court has already declined to exercise jurisdiction over
Crusader's state court action pursuant to the Colorado River
doctrine.  (Order, ECF No. 26 at 9-10.)  The Court will also
decline to exercise jurisdiction here under the Wilton/Brillhart
doctrine.

The Declaratory Judgement Act confers on federal courts
"unique and substantial discretion in deciding whether to declare
the rights of litigants." Wilton v. Seven Falls Co., 515 U.S.
277, 286 (1995) (reaffirming the application to declaratory
judgment actions of Billhart v. Excess Ins. Co. of America,
316 U.S. 491 (1942)).  The Declaratory Judgment Act is "'an
enabling Act, which confers a discretion on the courts rather
than an absolute right on the litigant.'" Id. at 287 (quoting
Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241
(1952)).

Here, Kumar and Links simply appear to be attempting to join
Crusader here as a means of delaying trial in the state court
action, a trial which is apparently scheduled for July of this
year.
///

To the extent that Kumar and Links are doing so, that would be a wholly inappropriate use of scarce judicial resources and could result in sanctions.

Because Kumar and Links have failed to state a claim against Crusader, and because their failure cannot be cured by amending their complaint, the Court grants Crusader's Motion to Dismiss Kumar and Links' Third-Party Complaint (ECF No. 42) against it without leave to amend.

**C.   Sua Sponte Dismissal of Godinez's Third Party Complaint against Crusader for Failure to State a Claim**

For the same reasons discussed in Section B, above, the Court dismisses, sua sponte and without leave to amend, Godinez's Third Party Complaint against Crusader (ECF No. 51).

Pursuant to Rule 12(b)(6), a court may dismiss a claim sua sponte for failure to state a claim when the plaintiff "cannot possibly win relief." Omar v. Sea-Land Service, Inc., 813 F.2d 986, 991 (9th Cir. 1987) (citing Wong v. Bell, 642 F.2d 359, 361-62 (9th Cir. 1981)).  A court may do so even when the defendant has not made a motion to dismiss.  Id.; Ricotta v. State of California, 4 F. Supp. 2d 961, 968 (S.D. Cal.1998), aff'd. 173 F.3d 861 (9th Cir. 1999).

As was true for Kumar and Links' Third Party Complaint, Godinez's Third Party Complaint fails to conform to the pleading requirements of Rule 8(a) and provides no persuasive basis for the Court to join Crusader as a Third Party Defendant in this action.

**D.    Sua Sponte Dismissal of both Kumar and Links' and Godinez's Cross-Claims for Failure to State a Claim**

The cross-claim and third party complaints of (1) Kumar and Links (ECF No. 42), and (2) Godinez (ECF No. 51) fail to sufficiently plead any facts or legal basis to put the other party on notice of the claims that they are apparently raising.[9]

Rule 13(g) provides that:

> A pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action.  The crossclaim may include a claim that the coparty is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant.

However, rule 13(g) is cabined by Rule 8(a)'s requirement that the pleader set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  See Rule 8(a). Here, both cross-claimants have failed to sufficiently set forth both a factual and a legal basis for their cross-claims sufficient to state a claim under Rule 8(a) as interpreted by Iqbal and Twombly and their progeny.

The cross-claims (ECF Nos. 42 and 51) are therefore sua sponte dismissed, with leave to amend.

///

///

///

---

[9] Remarkably, Kumar and Links have somehow managed to come up with forty-four affirmative defenses to Godinez's cross-claims.  (See ECF No. 64.)

**CONCLUSION**

As a matter of law, and for the reasons set forth above, NTD's Motion to Dismiss (ECF No. 37) is DENIED and Crusader's Motion to Dismiss Kumar and Links' Third-Party Complaint (ECF Nos. 56, 57) is GRANTED without leave to amend. In addition, the Court <u>sua</u> <u>sponte</u> DISMISSES, without leave to amend, Godinez's Third-Party Complaint against Crusader (ECF No. 51) for failure to state a claim. The Court also <u>sua</u> <u>sponte</u> DISMISSES, with leave to amend, the cross-claims by Kumar and Links, as well as Godinez (ECF Nos. 42 and 51). The Cross-Claimants shall file any amended cross-claims within thirty days of the electronic filing of this Order.

IT IS SO ORDERED.

Dated: July 6, 2012

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE