UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNIVERSAL CASUALTY COMPANY, | No. 2:11-cv-00934-MCE-AC |
|---|---|
| Plaintiff, | |
| v. | **MEMORANDUM AND ORDER** |
| FRED C. GODINEZ, III, et al., | |
| Defendants. | |

This action proceeds on Plaintiff Universal Casualty Company's ("Plaintiff") claims for breach of fiduciary duty (First and Third Causes of Action), intentional interference with contractual relations (Fourth Cause of Action), conversion (Fifth Cause of Action), and fraudulent transfer (Sixth Cause of Action) as alleged against Defendants Yogesh Kumar ("Kumar"), Links Insurance Services, Inc. ("Links"), and National Transportation Associates, Inc. D/B/A NTA General Insurance Agency, Inc. ("NTA") (collectively "Defendants").  Presently before the Court is Plaintiffs' Motion for Summary Judgment ("Motion") as to its First, Third, Fifth and Sixth Causes of Action.  For the following reasons, Plaintiff's Motion is DENIED.[1]

///

---

[1] Because oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local R. 230(g).

1

**BACKGROUND**

The parties in this case have a lengthy history of commercial interactions and the facts underlying this case are fairly involved.  Very generally, however, Plaintiff contends that Kumar, a licensed insurance broker, purchased a controlling interest in Sovereign General Insurance Services, Inc. ("SGI"), which acted as the managing agent for Plaintiff, an insurance carrier, pursuant to a Program Manager Agreement ("PMA").  As a managing agent, SGI was permitted to bind policies and collect premiums on behalf of Plaintiff, and SGI owed Plaintiff a fiduciary duty to separate and remit those premiums to it.  Plaintiff contends that Kumar, along with Defendant Fred C. Godinez, III ("Godinez"), and non-Defendants Martin Sullivan, Sr. ("Sullivan Sr."), and Martin Sullivan, Jr. ("Sullivan Jr."), managed SGI.  According to Plaintiff, Kumar was thus responsible for, among other things, SGI's later misappropriation of over $2 million in funds belonging to Plaintiff, funds that cannot be recouped from SGI because it is bankrupt.

More specifically, Plaintiff has offered evidence that, in April 2008, pursuant to a Stock Purchase Agreement ("SPA"), Kumar purchased Sullivan Sr. and his wife's 60% stake in SGI. Pl.'s Statement of Undisputed Facts ("SUF"), ECF No. 122 at ¶ 20.  Kumar agreed to pay the Sullivans $150,000 upon signing the SPA and $2.2 million in installments. Id. at ¶ 21.  Kumar also agreed to provide SGI with an additional $600,000-$800,000 in capital. Id. at ¶ 22.  Pursuant to the SPA, Kumar was slated to become SGI's Chairman of the Board and eventually its Chief Executive Officer ("CEO"). Id. at ¶ 24.

Kumar did pay the initial $150,000, and he loaned SGI at least $400,000. Id. at ¶¶ 25-26.  Moreover, according to Plaintiff, "from November 2008 through June 2009, Kumar controlled, directed and oversaw SGI's operations and the actions of SGI and its employees." Id. at ¶ 27.  Indeed, Plaintiff offers evidence that Kumar worked for SGI up to four days per week and that Kumar, among other things, managed employees and had exclusive authority to have checks issued on behalf of SGI. Id. at ¶¶ 28-33.

For his part, however, Kumar claims that when he negotiated the purchase of SGI, he was preparing for his wedding in India. Declaration of Yogesh Kumar ("Kumar Decl."), ECF No. 133 at ¶ 2. Given his prior history of working with SGI through his retail insurance business, Links, and given Sullivan Jr.'s representations regarding SGI's financials, Kumar felt comfortable negotiating that purchase despite having requested, but not received, a copy of the company's actual financial records Id. at ¶ 3.

Immediately after executing the SPA, Kumar left for India. Id. at ¶ 5. He avers that "[i]t was not the plan that [he] would buy an interest in the company and then take over operations." Id. To the contrary, "SGI had an effective management team in place, and . . . it was capable of running without [his] full time attention." Id. Kumar was thus willing to make additional loans to SGI to add value to his investment, and, upon his initial return from India, he agreed to continue to do so. Id.

Kumar is adamant that, throughout this time, he knew nothing of SGI's financial troubles. Id. at ¶ 6. He thus returned again to India to bring his new wife back to California. Id. While he was out of the country on this second trip, Kumar received several messages from Godinez asking for additional funds, which Kumar was able to arrange via a loan from a third-party business partner. Id. In fact, Kumar arranged a number of short-term loans to SGI and contends that "[i]n all cases where there [was] a loan to SGI from one of [his] friends or family members, it [was] because of the emergency circumstances, or because SGI had completely tapped [his] resources and he had no ability to make the loan." Id.

Indeed, Kumar estimates that he had put approximately $750,000 into SGI (not counting short term loans that had all been repaid). Id. at ¶ 9. According to Kumar, he continued to want to protect his investment, and thus, in late October or early November of 2008, he begin going into the office regularly. Id. He could not understand how SGI could be as cash poor as it was when it was purportedly generating so much revenue, and he was advised that the company's overhead was too high. Id. According to Kumar, Godinez and the Sullivans then asked him to come in as a cost-cutting

consultant. Id. "Any decision [Kumar] made as a consultant was subject to approval by Godinez and the Sullivans, but they approved much of what [he] suggested." Id. Kumar cut car allowances, reduced office space, and let some employees go. Id. He also learned that "the Sullivans had been using company money to pay their personal home mortgages, pay for vehicles for their wives and relatives, and [to fund] other business ventures." Id.

Finally, "[i]n late October or early November 2008, [Kumar] . . . learned the truth" that "SGI was out of trust by as much as four million dollars." Id. at ¶ 10. Kumar then sought to get out of the SPA. Id. at ¶ 11. Kumar and the Sullivans eventually amended the SPA, reducing Kumar's payment obligations to only the original $150,000 that he had already provided. Id. Shortly thereafter, however, in approximately January 2009, the Sullivans and Kumar rescinded altogether both the SPA and amended agreement. Id. at ¶ 12. In addition, "Sullivan Sr., as CEO, and Fred Godinez, as President, both confirmed in writing that [Kumar] was never a principal, owner or shareholder of SGI in [a] Statement of Ownership and Governance." Id. at ¶ 13.

Plaintiff contends that Kumar nonetheless continued to control SGI's daily operations. Indeed, Kumar continued to sign at least some checks on behalf of SGI, and two staff members, Ms. Brignolio, SGI's bookkeeper, and Ms. Barragan, SGI's office manager, testified that only Kumar was authorized to approve checks. SUF at ¶ 33. That being said, Kumar denies, among other things, that he put into place any banking procedures within SGI or that he had any authority over the accounting department. Kumar Decl. at ¶¶ 14, 17. He likewise denies that he took any funds owing to Plaintiff and avers instead that "[t]he repayment checks that SGI issued to Links and/or [him] or [his] agents were . . . repayments of loans or funds that SGI had received previously from Links and/or [him] and [his] agents and were all approved by SGI's management." Id. at ¶ 16.

For its part, Plaintiff maintains that despite having acquired the knowledge that SGI was out of trust, Kumar failed to notify Plaintiff or any other insurance carriers of that

fact. SUF at ¶¶ 77-78.  He instead used $2,377,041.60 in funds due to Plaintiff to, among other things, pay operating expenses, pay money to his own company Links, and repay loans he had made to SGI.  At some point during this time, Kumar also formed NTA, a competitor to SGI, and purportedly began to divert business away from SGI to his new company.  Id. at ¶¶ 52-57.

Eventually, in August 2009, the Sullivans filed for Chapter 7 bankruptcy. Judgments of $2,377,041.60 were entered against them by two different bankruptcy judges who found that they had breached their fiduciary duties and that their liability to Plaintiff was thus nondischargeable.  Id. at ¶¶ 13-16.

SGI was also placed in involuntary Chapter 7 bankruptcy.  Its President, Godinez, later agreed to have a $1.9 million judgment entered against him in the current action, and SGI now seeks to hold Kumar, Links and NTA liable for its losses as well.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 323-24.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

///

Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Id. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its

1 opponent must do more than simply show that there is some metaphysical doubt as to
2 the material facts." Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as
3 a whole could not lead a rational trier of fact to find for the nonmoving party, there is no
4 'genuine issue for trial.'"  Id. at 587 (internal citations omitted).

5 In resolving a summary judgment motion, the evidence of the opposing party is to
6 be believed, and all reasonable inferences that may be drawn from the facts placed
7 before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at
8 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
9 obligation to produce a factual predicate from which the inference may be drawn.
10 Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45, 1248 (E.D. Cal. 1985),
11 aff'd, 810 F.2d 898 (9th Cir. 1987).

### ANALYSIS

#### A. Breach of fiduciary duty claims

Plaintiff moves for summary judgment on its First and Third Causes of Action, which allege Kumar breached his fiduciary duty to Plaintiff.  The primary dispute before the Court now is thus whether Kumar was in a fiduciary relationship with Plaintiff.  A fiduciary relationship can arise as a matter of contract or as a matter of law.  Oakland Raiders v. Nat'l Football League, 131 Cal. App. 4th 621, 631 (2005).

There is no evidence in the record indicating that Kumar had contracted directly with Plaintiff to act as its fiduciary.  Kumar is not a party to the PMA which is the governing agreement between Plaintiff and SGI.  Moreover, while Kumar is licensed as an insurance broker, he was not listed as an agent for SGI in either California or Arizona.  Plaintiff has thus not shown it is entitled to judgment as a matter of contract alone.

Plaintiff nonetheless contends that Kumar is obligated as a fiduciary by virtue of his control of SGI, which in turn had contracted to act as Plaintiff's fiduciary and which was also its fiduciary as a matter of both California and Arizona law.  See Cal. Ins. Code

§ 1733 ("All funds received by any person . . . as premium or return premium on or under any policy of insurance . . . , are received and held by that person in his or her fiduciary capacity."); Ariz. Rev. Stat. § 20-485.06(a) ("All insurance charges or premiums collected by an administrator on behalf of or for an insurer or insurers, and return premiums received from such insurer or insurers, shall be held by the administrator in a fiduciary capacity."). More specifically, UCC claims that since Kumar managed the day-to-day operations of SGI, essentially as a CEO, he "received" UCC's funds on behalf of SGI and thus owed fiduciary duties to Plaintiff. According to Plaintiff, "every witness in the case, except Kumar, agrees that he ran the day-to-day operations of SGI during this period." Pl.'s Mot., ECF No.120 at 15-16.

Kumar denies this premise, averring that he was merely a consultant hired to cut SGI's expenses and thus was required to be consulted on day-to-day operations. Moreover, Kumar claims that, as a consultant, his duties were owed to SGI, not to UCC.

There are triable issues of fact as to whether Kumar ran the day-to-day operations of SGI, thus exercising control over the company and rendering himself liable to Plaintiff as a fiduciary. For example, Plaintiff has set forth evidence that Kumar controlled spending and made hiring and firing decisions. However, there is also more than a mere scintilla of evidence on which the jury could rely to reach the opposite conclusion (i.e., that Kumar was a consultant with no authority over the trust account). See Deposition of Yogesh Kumar, ECF No.134-5 at 65:15-25, ECF No. 134-6 at 172:5-174:18; Kumar Decl. at ¶¶ 14, 17; Deposition of Federico C. Godinez, ECF No. 134-3 at 65:2-16; Declaration of Kathy Brignolio ("Brignolio Decl."), ECF No. 132 at ¶ 9 ("At all times of my employment, to my knowledge, Mr. Kumar was a consultant.");[2] id. at ¶ 7, 14 (Kumar was never made aware of deposit procedures or accounting practices and "never

---

[2] The Court is cognizant that Plaintiff moved to strike Ms. Brignolio's declaration as a sham affidavit. See ECF No. 139. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991). Given that Ms. Brignolio is a third party to this litigation who appears to have no vested interest in its outcome, and given that her current statements appear consistent with at least some of her prior testimony, the Court declines to apply the sham affidavit rule to exclude this evidence. Plaintiff's Motion to Strike is thus DENIED.

directed [Ms. Brignolio] to issue a check from a trust account."); Deposition of Michael Deford, ECF No. 134-3 at 70:19-22 (Mr. Deford was the CFO of SGI and was responsible for monitoring the trust accounts.). Even Plaintiff's argument that Kumar's approval was required before checks could be cut can be interpreted either as evidence that: (1) Kumar made all operational decisions; or (2) the owners of SGI wanted to implement Kumar's cost-cutting suggestions and thus told the staff to run expenditures by Kumar before issuing checks.

Moreover, it appears that the objected to transfers were made after the SPA, at least arguably, was rescinded. Finally, there is also a triable issue of fact as to whether the funds transferred to Kumar and others belonged to Plaintiff in the first place. According to Kumar, those funds were utilized primarily to repay short-term loans to him, his other entities, or his friends and family members. Brignolio Decl. ¶ 13; Kumar Decl. ¶ 10. Given the above factual disputes, granting summary judgment would be improper. Plaintiff's Motion is thus DENIED as to its First and Third Causes of Action.

### B.     Conversion claim

By way of its Fifth Cause of Action, Plaintiff argues that Kumar converted the funds required to be held in trust for Plaintiff into a repayment of personal loans Kumar had made to SGI. "In California, the elements of a conversion are the creditor's ownership or right to possession of the property at the time of the conversion; the debtor's conversion by a wrongful act or disposition of property rights; and damages." In re Thiara, 285 B.R. 420, 427 (9th Cir. 2002) (internal citations and quotations omitted). Plaintiff contends that "by definition, a violation of [California Civil Code §] 1733 is a conversion." Pl.'s Mot. at 19. Plaintiff thus seeks summary judgment on the basis that because Plaintiff transferred funds belonging to Plaintiff to himself and to Links he is liable for conversion.

Plaintiff's argument is rejected for the reason already set forth above that there are triable issues of fact as to whether the money Kumar transferred out of SGI rightfully belonged to Plaintiff or instead constituted loan payments or returns on premiums to

9

Links. If the funds were not Plaintiff's in the first place, there can be no conversion. Plaintiff's Motion for Summary Judgment as to the Fifth Cause of Action is DENIED.

### C. Fraud claim

Finally, Plaintiff contends Kumar's transfers to Links and NTA constitute actual fraud. Pursuant to California Civil Code § 3439.04(a)(1), "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." There are a number of "badges of fraud," the bulk of which Plaintiff contends are present here:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04(b).

According to Plaintiff, the Court should find Kumar's transfers to Links and NTA rose to the level of fraud because: (a) Links and NTA are insiders; (b) Kumar continued to control the assets after he transferred them; (c) Kumar attempted to conceal the transfers to Links by masking them as payments under a producer agreement; (d) Kumar hid the fact that he was siphoning customers away from SGI and to NTA; (e) SGI was on notice that legal action by Plaintiff was imminent; (f) the assets Kumar transferred to Links and NTA constituted substantially all of SGI's assets at the time; and (g) SGI was insolvent and unable to meet its financial obligations to Plaintiff.

As to Links, however, there again remains a triable issue of fact as to whether the funds transferred belonged to Plaintiff or whether they were instead proper payments to Links.  As to whether NTA wrongfully pilfered SGI's business, a triable issue of fact also exists because Kumar avers both that NTA did not move business from SGI, but also that it would have been impossible to do so.  Kumar Decl., ¶ 22.  Given the triable issues of fact that remain, Plaintiff's Motion for Summary Judgment as to the Sixth Cause of Action is DENIED as well.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (ECF No. 120) and Motion to Strike (ECF No. 139) are DENIED.

IT IS SO ORDERED.

Dated:  March 7, 2014

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT